**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FILED

MAR 3 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

GLOBALOPTIONS, INC.,
75 Rockefeller Plaza,
27th Floor,
New York, NY 10019,

        Plaintiff,

    v.

NEIL LIVINGSTONE
700 New Hampshire Avenue,
Washington, D.C. 20037,

        Defendant.

Case: 1:07-cv-00608
Assigned To : Friedman, Paul L.
Assign. Date : 3/30/2007
Description: GLOBAL OPTIONS V. LIVINGSTONE

## MOTION FOR A TEMPORARY RESTRAINING ORDER

COMES NOW plaintiff GlobalOptions, Inc., by and through counsel, and

respectfully moves this Court to issue a temporary restraining order pursuant to Rule

65(b) of the Federal Rules of Civil Procedure against defendant Neil Livingstone. As

grounds therefore, plaintiff incorporates by reference his Memorandum in Support of a

Temporary Restraining Order and plaintiff's Declaration of March 29, 2007.

WHEREFORE, plaintiff requests that temporary restraining order be entered

requiring the Neil Livingstone to cease and desist from any further solicitations of any

present or perspective clients, customers, or accounts of GlobalOptions; to cease and

desist from offering services provided by GlobalOptions; and to cease and desist from

publishing disparaging and defamatory statements concerning GlobalOptions. Plaintiff

requests that bond be waived or set in a de minimus amount.

Respectfully submitted,

Brian W. Shaughnessy, DC 89946
913 M Street, N.W.
Suite 101
Washington, D.C. 20001
(202) 842-1700

Attorney for Plaintiff
Global Options, Inc.

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GLOBALOPTIONS, INC.,
75 Rockefeller Plaza,
27th Floor,
New York, NY 10019,

      Plaintiff,

      v.

NEIL LIVINGSTONE               Case No. _____
Executive Action
700 New Hampshire Avenue, N.W.,
Washington, D.C. 20037,

      Defendant.

## MEMORANDUM IN SUPPORT OF MOTION
## FOR A TEMPORARY RESTRAINING ORDER

COMES NOW Plaintiff GlobalOptions, Inc., by and through counsel, and in support of its motion for a temporary restraining order, pursuant to Federal Rule of Civil Procedure 65, requiring defendant Neil Livingstone to honor his Employment and Noncompete Agreement, relies on this Memorandum in Support of Motion for Temporary Restraining Order, plaintiff's Declaration and Exhibits thereto, filed herewith, and the entire record herein.

### FACTUAL BACKGROUND

In or about 1998, defendant Neil Livingstone founded and was the Managing Member of GlobalOptions, LLC, a Delaware limited liability company, a security and investigations firm in Washington, DC. In 2002, defendant Livingstone decided that his interests would be best served by reorganizing GlobalOptions from a limited liability

company to a Delaware corporation and induced private investors to contribute capital to the company. As part of the inducement, the investors required defendant Livingstone to enter into an Employment Agreement and Noncompetition Agreement.

In January 2002, defendant Livingstone entered into the Employment and Noncompetition Agreement, attached to the Schiller Declaration as Exhibit 1, received a substantial stock position and an appointment as Chairman of GlobalOptions. The Employment and Noncompetition Agreement had particularly strong Non-Compete, Section 6, and Proprietary Information, Section 7, clauses that survived the termination of employment pursuant to Section 5.5.

Defendant's primary responsibilities were in the area of business development through use of his substantial contacts in Washington and abroad. In essence, defendant solicited and obtained clients for GlobalOptions and GlobalOptions performed the services called for in the contracts it obtained through defendant's efforts and other marketing sources.

In 2005, GlobalOptions, Inc. was a party to a merger, wherein GlobalOptions, Inc. became a subsidiary of GlobalOptions Group, Inc., a public company required to file reports to the Security and Exchange Commission under the 1933 Securities Act.

This relationship worked reasonably well until after the merger when defendant's production diminished and his expenses became extraordinarily high. In 2006, defendant and GlobalOptions began discussions about Defendant's transition from the company. These negotiations led to an agreement that defendant would leave the company on January 31, 2007 under certain terms. That agreement was memorialized in a letter dated

2

October 16, 2006 from Harvey Schiller, Chief Executive Officer of GlobalOptions to defendant Livingstone, attached to the Schiller Declaration as Exhibit 2.

The letter agreement provided that defendant would leave on January 31, 2007, but that his involvement with the Washington office would conclude on October 15, 2006. Defendant was permitted to retain office space until January 31, 2007 to make a smooth transition from the Company. Defendant was permitted to exercise any vested stock options and to maintain a continued business relationship under which Defendant's clients could be serviced by GlobalOptions.

A major concern of the transition letter was maintaining the reputation of both parties so that any discussion surrounding Defendant's departure would not be construed as disparaging about either party. Ex. 2. It was also made clear in the letter that the noncompete provision would remain in effect, although the Company might agree on a case-by-case basis to assure continued services for defendant clients. Upon that understanding, defendant terminated his employment on January 31, 2007 as agreed and began a new business, ExecutiveAction, in Washington, D.C.

Commencing at some time after his departure from GlobalOptions, defendant sent out more than one thousand letters to persons and entities that were present and potential clients of GlobalOptions--as well as entities in strategic alliances with the clients--in direct violation of the Employment and Noncompetition Agreement and the transition letter of October 16, 2006.

Exemplary of defendant's competing solicitation letters is his letter to Janet Tramonte e-mailed on March 26, 2007, attached to the Schiller Declaration as Exhibit 3. The letter complains about the alleged constraints of being in a public company, and

3

defendant claims that he was uncomfortable with disclosures that GlobalOptions had to make, especially concerning GlobalOptions' "discreet clients and cases." Thus, defendant has accused GlobalOptions, a public company involved in security and confidential investigations for major corporations, governments and similar clients, of disclosing information about its clients and their cases to the public. Few statements can be created better designed to wreak professional discredit on a security company than those made by defendant.

Those defamatory allegations were set in the context of solicitations of GlobalOptions' clients such as the recipient of Ex. 3, who is a long-time client of GlobalOptions. In the letter, defendant claims that he can provide the same range of security, investigative, intelligence and GlobalOptions' problem-solving solutions as can GlobalOptions and he seeks to provide such assistance and support to the potential client. Thus, defendant has solicited GlobalOption's present and potential clients, has entered competition in the same professional areas and has defamed GlobalOptions in its professional capacity. In addition, from analyzing the targets of defendant's solicitations and defamations, it is highly likely that defendant has violated Section 7.1(a) by using customer lists of GlobalOptions to direct his solicitations.

GlobalOptions has gotten a number of adverse reactions to defendant's solicitations from clients and others in the industry and potential client pool, which have caused great concern. Indeed, that concern was contemplated by Section 6.4 of the Employment and Noncompetition Agreement, which provides:

> The restrictions contained in this Section 6 are necessary for the protection of the business and goodwill of the Company and/or its affiliates and are considered by the Employee to be reasonable for such purposes. The Employee agrees that any breach of this Section 6 will cause the Company and/or its

4

affiliates substantial and irrevocable damage and therefore, in the event of any such breach, in addition to such other remedies which may be available, the Company shall have the right to seek specific performance and injunctive relief.

Here it is evident that injunctive relief is warranted.

## LEGAL STANDARD

It is well established that to obtain a temporary restraining order or preliminary injunction, the plaintiff must demonstrate (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the requested relief is not granted, (3) that an order or injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the temporary restraining order or injunction.  CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995);  Sea Containers Ltd. v. Stena AB, 890 F.2d 1205, 1208 (D.C. Cir. 1989); and Mova Pharmaceutical Corp. v. Shalala, 329 U.S.App.D.C. 341, 140 F.3d 1060 (D.C.Cir.1998).  The trial court is to balance those factors, not necessarily giving equal weight to each.  Cuomo v. United States Nuclear Regulatory Comm'n, 772 F.2d 972, 974 (D.C. Cir. 1985).  "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated.  Although the grant of interim relief is an extraordinary remedy, it should be granted in the limited circumstances which clearly demand it."  See United States v. Jefferson Co., 720 F.2d 1511, 1519 (11th Cir. 1983).

## ARGUMENT

## I.    THE BALANCE OF HARDSHIPS FAVORS THE PLAINTIFF.

"Although the decision to grant or deny interlocutory injunctive relief depends upon a flexible interplay among all the factors considered, it is clear that the two more

important factors are those of probable irreparable injury to the plaintiff without a decree and of likely harm to the defendant with a decree." Maryland Undercoating Co., Inc. v. Payne, 603 F.2d 477, 481 n.9 (4th Cir. 1979). In this case, the balance of hardship favors the plaintiff.

Here it is evident that defendant Livingstone is making a serious attack on the client base of GlobalOptions. That client base, while extensive, is a rather small universe with strong interconnections among the clients. Defendant's solicitations and defamations quickly spread among the client base. Indeed, that is how GlobalOptions found out so quickly about the solicitations. If these publications are not ceased immediately, GlobalOptions' client base and reputation will be damaged beyond repair.

On the other hand, defendant Livingstone and his new company ExecutiveAction cannot be injured by delaying its solicitations until this matter can be fully resolved. According to the noncompete clause in the Agreement, defendant cannot commence his performance of contracts gained by his solicitations for one year from January 31, 2007.

Accordingly the balance of hardships is heavily weighted toward plaintiff, and injunctive relief should be granted to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated.

**B.    The Public Interest Weighs in Favor of the Plaintiff.**

In considering the balance of the hardships, "the court should consider wherein lies the public interest, sometimes described as preserving the status quo ante litem until the merits of a serious controversy can be fully considered by a trial court." Maryland Undercoating Co., 603 F.2d at 481. Preventing defendant from destroying GlobalOptions, Inc. through defendant's defamations, as well as giving plaintiff--a public

6

company with many stockholders, including defendant and numerous employees-an

opportunity to preserve its client base and place in the industry, is plainly in the public

interest.

## II.    THE PLAINTIFF HAS DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.

As set forth above, the covenant not to compete is limited in time to one year

from defendant's leaving GlobalOptions and is limited to the unusually small industry of

security and investigations.   This is well within the limitations on such noncompetition

provisions in the District of Columbia. It is well-settled that

> (1) the restraint on trade must be reasonable; (2) if the restraint is "not larger
> or more extensive than was required for the necessary protection of the
> [business interest], then the contract would seem to be valid"; and (3) "[a]fter
> a party has deliberately made his contract, and received consideration
> therefor, it must plainly appear that it contravenes public policy before the
> courts will declare it void upon that ground." Godfrey v. Roessle, 5 App.
> D.C. 299, 303-04 (1895). Thus, one who sold his assets in a drug store
> business and "agree[d] not to conduct, own, or operate a drug store within a
> radius of ten (10) blocks" of the buyer, was bound by the covenant not to
> compete. Allison v. Siegle, 65 App. D.C. 45, 46 79 F.2d 170, 171 (1935).
> See also Deutsch v. Bartsky, 795 A. 2d 669 (D.C. App. 2002).

Here, defendant Livingstone benefited from the investment of capital in the firm

in 2002 and by becoming Chairman and, accordingly, he signed the Agreement with the

noncompete clause.  After receiving a high salary and other benefits for years, when he

departed he retained some of his stock and converted stock options.  This gave him ample

consideration for the restrictions on his soliciting GlobalOptions' clients and invading its

industry position for one year.  Those restrictions are no more extensive than necessary to

protect GlobalOptions' business interest for a short period.  Since there can be no public

policy reason to destroy plaintiff's business, and defendant's violations of the Agreement

are indisputable, GlobalOptions has demonstrated a high likelihood of success on the

merits

## CONCLUSION

WHEREFORE, for the foregoing reasons and others that may be developed in a

hearing on this motion, plaintiff respectfully requests that this Court enter an order

temporarily enjoining defendant Livingstone and his agents, corporations, associates, and

affiliates from violating the noncompete and proprietary information provisions of the

Agreement and from continuing to defame plaintiff GlobalOptions.

Respectfully submitted,

Brian W. Shaughnessy, DCN 89946
913 M Street, NW
Suite 101
Washington, DC  20001
(202) 842-1700

Attorney for the Plaintiff
Global Options, Inc.

8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GLOBALOPTIONS, INC.,
75 Rockefeller Plaza,
27th Floor,
New York, NY 10019,

      Plaintiff,

      v.

NEIL LIVINGSTONE
Executive Action
1300 Connecticut Avenue, N.W.,
Washington, D.C. 20036,

      Defendant.

Case No. _____

## DECLARATION OF HARVEY SCHILLER

      COMES NOW Harvey Schiller and declares and says, based on his own personal knowledge, as follows:

1.     I am the Chairman of GlobalOptions Group, Inc. of which GlobalOptions, Inc. is a wholly owned subsidiary and I have personal knowledge of the facts stated herein.

2.     In 2002, defendant Neil Livingstone reorganized GlobalOptions from a limited liability company to a Delaware corporation.

3.     Private investors required defendant Livingstone to enter into an Employment Agreement and Noncompetition Agreement. An authentic copy of the Agreement is attached hereto as Exhibit 1.

4.    Defendant's primary responsibilities were to solicit clients for GlobalOptions and GlobalOptions performed the services called for in the contracts obtained.

5.    In 2005. GlobalOptions became a subsidiary of GlobalOptions Group, Inc., whose headquarters are in New York.   GlobalOptions Group, Inc., is a company required to file reports to the Security and Exchange Commission under the 1933 Securities Act.

6.    In 2006, defendant and GlobalOptions began negotiations, which led to an agreement that defendant would leave the company on January 31, 2007 under certain terms. That agreement was memorialized in a letter dated September 19, 2006, attached hereto as Exhibit 2.

7.    The transition letter provided for defendant's departure in manner that would maintain the reputation of both parties so that any discussion surrounding Defendant's departure would not be construed as disparaging about either party. Ex. 2.  It was also made clear in the letter that the noncompete proprietary information provisions would remain in effect as set forth in Section 5.5 of the Employment Agreement and Noncompetition Agreement.

8.    After defendant's departure on January 31, 2007 from GlobalOptions, I have been informed that defendant has sent out more than one thousand letters to persons and entities that were present and potential clients of GlobalOptions.  Approximately ten clients have told me that they have received solicitation letters.  I have reviewed the Tramonte letter e-mailed on March 26, 2007, attached hereto as Exhibit 3, and find its language similar to what I have learned about other letters sent by defendant. Exhibit 3 violates the non-compete section of the Employment and Noncompetition Agreement and is contrary to the intent of the transition letter of September 19, 2006. From reports from

clients and Exhibit 3. I have concluded that defendant is using GlobalOptions' customer list in violation of the Proprietary Information section of the Agreement to direct his letters.

9.     Defendant has solicited GlobalOption's present and potential clients, has entered competition in the same professional areas and has defamed GlobalOptions in its professional capacity. See Exhibit 3.

10.     GlobalOptions has gotten a number of adverse reactions to defendant's solicitations from clients and others in the industry and potential client pool, which have caused it great concern. The allegations in Exhibit 3 that GlobalOptions, a public company involved in security and confidential investigations for major corporations, governments and similar clients, discloses information about its clients and their cases to the public is extremely damaging to the business reputation of GlobalOptions.

11.     It is urgent that defendant be required to cease sending out solicitation letters that not only interfere with GlobalOptions' relations with its clients, but also defame GlobalOptions' in its conduct of its highly confidential business activity.

    I declare under penalty of perjury that the foregoing is true and correct.

Executed on:

March 29, 2007
New York, NY

                              Harvey Schiller

# GLOBALOPTIONS, INC.
## EMPLOYMENT AND NONCOMPETITION AGREEMENT

This Employment Agreement (the "Agreement"), made this _____ day of January, 2002 is entered into by and between GlobalOptions, Inc., a Delaware corporation, with its principal place of business at 1625 L Street, N.W., Washington, D.C. 20036 (the "Company"), and Neil C. Livingstone (the "Employee").

The Company desires to employ the Employee, and the Employee desires to be employed by the Company. In consideration of the mutual covenants and promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto agree as follows:

1 .    <u>Term of Employment</u>. The Company hereby agrees to employ the Employee, and the Employee hereby accepts employment with the Company, upon the terms set forth in this Agreement, for the period commencing on the date hereof and ending upon January ___, 2007, unless otherwise terminated pursuant to the terms hereof. The term shall automatically extend for an additional one year period on the first day of the final year of the term, or any extension thereof, as the case may be, on the same terms and conditions as set forth herein, unless either the Company or the Employee gives written notice to the other within 60 days before the first day of the final year that the term shall not automatically be extended; provided, however, that the Company and Employee may amend this Employment Agreement during such 60 day period to provide for such additional or modified terms and conditions as they shall mutually agree in writing.

2.    <u>Capacity</u>. The Employee shall serve as Chairman of the Board of Directors. The Employee shall be based at the Company's office in the Washington, D.C. metropolitan area or at such other area as the Company shall reasonably deem necessary. The Employee hereby accepts such employment and agrees to undertake the duties and responsibilities inherent in such position and such other duties and responsibilities as the Board of Directors shall from time to time reasonably assign to him. The Employee agrees to devote his entire business time, attention and energies to the business and interests of the Company during the Employment Period, provided however, the Employee shall be free to engage in, outside the Company, the activities described in Exhibit A. The Employee agrees to abide by the rules, regulations, instructions, personnel practices and policies of the Company and any changes therein which may be adopted from time to time by the Company.

3.    <u>Compensation and Benefits</u>.

3.1   Effective on the date of employment, the Company shall pay the Employee, a base salary of $260,000, per annum ("Base Salary"). The Employee shall be eligible for a bonus based upon mutually agreed to goals, established by the Compensation Committee formed

by the Board of Directors. All bonuses are pro-rated from the date of employment to December 31. All bonuses set out in this Section shall be payable in accordance with Company policy, which is based upon annual review, unless mutually agreed to by the Employee and Company. Increase in the Base Salary will be based on the Company's performance as well as Employee's contribution to that performance, and shall be determined the Compensation Committee.

      3.2    In addition to the bonus set forth in Section 3.1, above, the Employee shall be entitled to participate in all bonus programs that the Company may establish for executives, and other benefit programs that the Company establishes  Employee shall be entitled to four weeks of annual paid vacation and two weeks of annual sick leave.  If vacation or sick leave is not used in any given year, it shall not carryover to the next year, and Employee shall receive no compensation therefor.  The Company shall provide a Disability Plan, travel accident insurance, and shall procure and pay premiums on a Key Man Insurance policy on the life of the Employee in the face amount of at least $500,000 having the Employee or the Employee's designee as beneficiary. The Employee will be eligible to participate in the Company's Incentive Stock Option Plan. The employee shall be provided medical and dental insurance, and be reimbursed for an annual physical, by a physician of his choice, of an amount up to $1,500 per examination.

      3.3    The Company shall reimburse Employee for all reasonable business and professional expenses incurred by the Employee in connection with his employment within thirty (30) days of the Company's receipt of appropriate documentation that conforms to the requirements of the Company's expense reimbursement procedures.

      4.    <u>Employment Termination</u>.  The employment of the Employee by the Company pursuant to this Agreement shall terminate upon the occurrence of any of the following:

      4.1    At the election of the Company, for cause, immediately upon written notice by the Company to the Employee.  For the purposes of this Section 4.1, "cause" for termination shall be deemed to exist upon: (a) failure to cure a material breach by the Employee of the terms of this Agreement within thirty (30) days of receipt of written notice of such breach from the Company; (b) illegal use or possession by Employee of drugs or controlled substances; (c) malfeasance, reckless conduct, gross negligence or willful misconduct relating to the Employee's duties; or (d) the commission by the Employee of,  any crime involving moral turpitude, any felony, or any act of dishonesty or fraud against the Company;

      4.2    Upon the death or thirty (30) days after the disability of the Employee.  As used in this Agreement, the term "disability" shall mean the inability of the Employee, due to a physical or mental disability, for a period of one hundred and eighty (180) days, regardless of whether consecutive, during any 360-day period to perform the services contemplated under this Agreement.  A determination of disability shall be made by a physician satisfactory to both the Employee and the Company, provided that if the Employee and the Company do not agree on a physician, the Employee and the Company shall each select a physician and these two together shall select a third physician, whose determination as to disability shall be binding on all parties;

4.3     At the election of the Employee, upon not less than thirty (30) days prior written notice of termination; or

4.4     At the election of the Company, otherwise than (i) for cause, or (ii) pursuant to delivery by the Company of a notice not to renew this Agreement for any additional term pursuant to Section 1, upon not less than thirty (30) days prior written notice.

5.     Effect of Termination.

5.1     Termination for Cause or at Election of Employee.  In the event the Employee's employment is terminated for cause pursuant to Section 4.1, or at the election of the Employee pursuant to Section 4.3, the Company shall pay to the Employee the compensation and benefits otherwise payable to him under Section 3 through the last day of his actual employment by the Company.

5.2     Termination for Death.  If the Employee's employment is terminated by death pursuant to Section 4.2, the Company shall pay to the estate of the Employee the compensation, benefits and expense reimbursements that would otherwise be payable to the Employee up to and including the date of the Employee's death . The Key Man Policy proceeds shall be payable as the Employee instructed pursuant to such policy.

5.3     Termination for Disability.  If the Employee's employment is terminated by the Employee's disability pursuant to Section 4.2, the Company shall pay to the Employee the compensation, benefits and expenses reimbursements that would otherwise be payable to the Employee up to and includint the date of such termination. Any Disability Insurance shall be payable as the Employee instructed pursuant to such policy.

5.4     Termination by the Company without Cause.  If the Employee's Employment is terminated at the election of the Company pursuant to Section 4.4, the Company shall pay to the Employee as severance pay, in accordance with the Company's payroll practices, his Salary (defined later in this Subsection) and medical and dental medical insurance, long term disability and Key Man Policy at the Company's expense for a period equal to the shorter of (i) twelve (12) months, or (ii) the remainder of the employment term under this Agreement. . Employee will not be required to mitigate the amount of any payment provided in this Section 5.4 by seeking other employment or otherwise. If the Employee is subsequently employed by another employer, the Employee shall continue to be entitled to the  Salary payable to Employee pursuant to this Section 5.4 but shall no longer be entitled to receive from the Company any other benefits provided for pursuant to this Section 5.4. The term Salary used in this Section 5.4 shall be as follows: (i) the then base salary of the Employee, plus (ii) the amount equal to the previous year's bonus awarded to the Employee.

5.5     Survival.  The provisions of Sections 6 and 7 shall survive the termination of this Agreement, provided the Company is not in breach of this agreement.

6.    <u>Non-Compete.</u>

6.1    So long as the Company is not in material breach of this Agreement, during the Employment Period and the twelve (12) month period beginning on the day of termination, the Employee will not directly or indirectly, privately or as an employee, individual proprietor, partner, stockholder, officer, employee, director, joint venturer, investor, lender, or in any other capacity whatsoever (other than as the holder of not more than one percent (1%) of the total outstanding stock of a publicly held company):

(a)    recruit, hire, solicit or induce, or attempt to induce, or assist others in hiring, soliciting or inducing, any employee or employees of the Company or its affiliates to terminate their employment with, or otherwise cease their relationship with, the Company or its affiliates;

(b)solicit, divert or take away, or attempt to divert or to take away, the business or patronage of any of the clients, customers or accounts, or prospective clients, customers or accounts, of the Company or its affiliates which were contacted, solicited or served by the Employee while employed by the Company. The terms "client" and "customer" as used herein shall mean such firms or agencies to which the Company or any affiliate of the Company has provided services or sold products within twelve (12) months prior to the date of termination of the Employee's employment; or

(c) engage in the rendering of any of the services that are provided by the Company as of the time of the Employee's termination or that are contemplated by any business plan approved by the Board of Directors at the time of the Employee's termination

6.2    The parties agree that the relevant public policy aspects of covenants not to compete have been discussed, and that every effort has been made to limit the restrictions placed upon the Employee to those that are reasonable and necessary to protect the Company's legitimate interests.

6.3    If any restriction set forth in this Section 6 is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable; provided, however, that if the period of time over which the restrictions set forth in this Section 6 apply is reduced, the period of time for which the Company is required to make severance payments pursuant to Section 5.4 shall be similarly reduced.

6.4    The restrictions contained in this Section 6 are necessary for the protection of the business and goodwill of the Company and/or its affiliates and are considered by the Employee to be reasonable for such purposes.  The Employee agrees that any breach of this

Section 6 will cause the Company and/or its affiliates substantial and irrevocable damage and therefore, in the event of any such breach, in addition to such other remedies which may be available, the Company shall have the right to seek specific performance and injunctive relief.

7.    Proprietary Information and Developments.

   7.1    Proprietary Information.

         (a)    Employee agrees never to reveal the business methods or business secrets (all inclusive) of the Company, its affiliates, or of its customers to anyone other than the Company and authorized customer personnel.   Such business methods and secrets shall include but are not limited to, computer programs, data systems, trade secrets, inventions, products, processes, methods, techniques, formulas, compositions, compounds, discoveries, projects, developments, plans, research data, clinical data, financial data, pricing policies, personnel data, customer and supplier lists and all other Company, affiliate or customer business and technological information.  Employee will not disclose any Proprietary Information to others outside the Company or use the same for any unauthorized purposes without written approval by an officer of the Company, either during or after his employment, unless and until such Proprietary Information has become public knowledge without fault by the Employee.

         (b)    Employee agrees that all files, letters, memoranda, reports, records, data, sketches, drawings, laboratory notebooks, program listings, or other written, photographic, or other tangible material containing Proprietary Information, whether created by the Employee or others, which shall come into his custody or possession, shall be and are the exclusive property of the Company to be used by the Employee only in the performance of his duties for the Company.

         (c)    Employee agrees that his obligation not to disclose or use information, know-how and records of the types set forth in paragraphs (a) and (b) above, also extends to such types of information, know-how, records and tangible property of affiliates of the Company, customers of the Company or suppliers to the Company or other third parties who may have disclosed or entrusted the same to the Company or to the Employee in the course of the Company's business.

         (d) Employee has read, understood and agreed to the Intellectual Property Agreement attached hereto as Exhibit B relating the Company's ownership of Intellectual Property and proprietary information and the non-disclosure obligations of Employee.

      7.2    Other Agreements. The Employee hereby represents that he is not bound by the terms of any agreement with any previous employer or other party to refrain from using or disclosing any trade secret or confidential or proprietary information in the course of his employment with the Company or to refrain from competing, directly or indirectly, with the business of such previous employer or any other party.  Employee further represents that his performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data

acquired by him in confidence or in trust prior to his employment with the Company. The Company and the Employee acknowledge that this Agreement shall replace the previous employment agreement entered into by GlobalOptions, LLC and the Employee, and all terms and conditions of that agreement are null and void.

8.    Notices.  All notices required or permitted under this Agreement shall be in writing and shall be deemed effective upon delivery personally, by facsimile or by overnight mail, or upon deposit in the United States Post Office, by registered or certified mail, postage prepaid, addressed to the other party at the address shown above, or at such other address or addresses as either party shall designate to the other in accordance with this Section 8.

9.    Pronouns.  Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter pronouns, and the singular forms of nouns and pronouns shall include the plural, and vice versa.

10.    Entire Agreement.  This Agreement constitutes the entire agreement between the parties and supersedes all prior agreements and understandings, whether written or oral, relating to the subject matter of this Agreement.

11.    Amendment.  This Agreement may be amended or modified only by a written instrument executed by both the Company and the Employee.

12.    Governing Law.  This Agreement shall be governed and construed by the laws of the District of Columbia. No claims may be brought concerning the validity or interpretation of this Agreement other than in the courts of the District of Columbia.

13.    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of both parties and their respective successors and assigns, including any corporation with which or into which the Company may be merged or which may succeed to its assets or business, provided, however, that the obligations of the Employee are personal and shall not be assigned by him.

14. Miscellaneous.

14.1    No delay or omission by the Company in exercising any right under this Agreement shall operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion shall be effective only in that instance and shall not be construed as a bar or waiver of any right on any other occasion.

14.2    The captions of the sections of this Agreement are for convenience of reference only and in no way define, limit or affect the scope or substance of any section of this Agreement.

14.3   In case any provision of this Agreement shall be invalid, illegal or otherwise unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby.

14.4   Employee understands and agrees that the business ethics of the Company and personal standards and ethics of its employees, must at all times be above reproach, and the Employee agrees to conduct himself in a manner to reflect credit upon the Company. Employee understands that employment with the Company is contingent upon satisfactory verification of all statements made by Employee in the employment application process and completion of a satisfactory background check. Employee understands that any illegal use or possession of drugs or controlled substances could result in immediate termination of the employment relationship. Employee further understands and agrees that he shall not, while employed by the Company, engage in any other employment or business venture without the written consent of the Company, except as provided in Section 2 of this Agreement. Employee agrees to inform and discuss with the Company any other employment or business venture that may constitute a conflict of interest with the Company.

15.   This Agreement shall not be considered valid unless signed by the Employee and an official authorized by the Company to sign such Agreement.

Employee: _____          Date: 1/24/02

_____
GlobalOptions, Inc.          Date: 1/24/02

October 16, 2006


Neil Livingstone. CEO
Global International
1615 L Street, N.W.
Suite 300
Washington, D.C. 20036


Dear Neil:

In light of your conversations with Morton Taubman, I thought it would be useful to update our previous correspondence and to discuss further the premise of our September 7th meeting in New York and begin your transition from the Company.  In our meeting we discussed our mutual agreement that your employment agreement with GlobalOptions. Inc. will not be renewed on its expiration date January 31, 2007, and no further payments from the company will be due to you after such expiration date. While we did not discuss specifics as to your transition from the Company, we will need to put in place the steps necessary to accomplish such:

1.    We will work within the next few days with our public relations consultants to develop a press release to the public for your departure from the Company wherein we will come to a mutual agreement what should be stated in such press release, and such press release will be provided to you for your final review. Further to that end, we will have a meeting with the Advisory Board on October 16th and I plan to announce to them your decision to leave GlobalOptions with our expectations that you will continue to assist the company in the future in some capacity yet to be determined. Finally on the same day, I will address the employees of GlobalOptions and indicate the same to them. and hopefully provided a positive message to them.

2.    The Company will continue to comply with all of the terms and conditions of your employment agreement and it is understood that you will not afford any bonus payments for the fiscal year end December 31, 2006. You will be provided the opportunity to exercise any of the vested stock options previously granted to you under the Company's Option Plans within thirty days of January 31, 2007.

3.    In order to provide sufficient time to develop your future plans, you, and I will work with the other personnel in the Washington office to assure a smooth transition over the coming months.  We will review with you each client of the Company to determine the necessity for your continued services to such clients for the remainder of your employment term. coupled with developing a protocol by and between the Company and you

Ex. 2

for the possibility of you continuing providing services beyond the
employment term. Thomas Ondeck and you shall work together to
determine, for each client, if your continued services are required for such
client, and mutually arrive at a fee schedule for such services, if necessary.
We envision that your day to day involvement with the Washington office
will conclude November 15, 2006 (the "Departure Date").

4.      We understand that you will not need office space with the Company after
        your Departure Date, however the Company will continue to provide you
        with administrative assistance out of the GlobalOptions' Washington
        office from November 15, 2006 until January 31, 2007.

5.      In light of the SEC and its requirements for internal control, I will be
        responsible for pre-approving and reviewing all of your Company
        expenses for the future period of your employment. From the date hereof,
        no Company expenses from you will be permitted unless they are pre-
        approved. Without limiting the foregoing, the car service, which you use
        in the Washington office, must be terminated on or before November 15,
        2006. After the Departure Date, if you so choose to maintain the car
        service, this will be at your personal cost and only reimbursable by the
        Company on a pre-approved basis.

6.      You and I can discuss how you and the Company can continue to work
        together in some senior *ex officio* consultant capacity and the remuneration
        thereto, with the thought of you joining the Advisory Board with a
        mutually agreed to title.

7.      As we discussed, the clients of the Company are assets of the Company.
        Your employment agreement addresses your inability to solicit the
        Company's clients after the term of your employment agreement. While I
        am not at liberty to waive this provision, I did state and as described
        above, that you and Thomas Ondeck will review carefully the needs of our
        clients and on a case-by-case basis arrive at some agreement to assure
        continued services for our clients. Further, as stated above, you and
        Thomas Ondeck will work together to assure proper representation of the
        client, and you and Thomas Ondeck will, on each client , determine what
        services are required of you to accomplish such. I recognize that a client
        may solicit your services subsequent to the term of your employment
        agreement (January 31, 2007), and in such event, we assume you will
        work with Thomas Ondeck in assuring a smooth transition and possible
        continued services of GlobalOptions with such client(s).

I trust the above is a basis for our future discussions and hopefully we can
resolve all of the issues before us. If the above represents your understanding of
our September 7th meeting and the process to be put into place for your transition

from the Company, please indicate your agreement, below. Of course this letter will have to be approved by the Board of Directors, and I intend, if you execute such, to present signed letter at our next Board meeting, on October 17, 2006.

Your efforts in the past have helped establish the framework for the vision of the Company and hopefully the future success of the Company and I know, you being one of the largest single shareholder will continue to assist the Company in its growth.

If the foregoing is acceptable please sign in the space indicated below.

Very truly yours

Harvey Schiller
Chief Executive Officer

Accepted and agreed to:

Neil Livingstone

Oct 16, 2006
Date

Cc:     Jeff Nyweide
        Andy Kaslow

**From:** Jill Horowitz [mailto:jhorowitz@executiveaction.com] **On Behalf Of** Neil Livingstone
**Sent:** Monday, March 26, 2007 3:25 PM
**To:** Janet Tramonte
**Subject:** ExecutiveAction

Dear Frank,

I hope this letter finds you well. As you know, we took GlobalOptions public about a year and a half ago and the company continues to grow successfully.

Nevertheless, I left GO on January 31. It was a difficult decision since I founded GlobalOptions in 1998, but I did not like the bureaucratic and other constraints of a public company, nor was I comfortable with some of the disclosures that have to be made, especially concerning our discreet clients and cases.

Accordingly, I founded a new company called ExecutiveAction, which is headquartered on Connecticut Avenue in Washington. It will provide the same range of security, investigative, intelligence, and global problem solving solutions as GlobalOptions, but in addition we've established an M & A practice to focus on acquisitions so that we can rapidly scale up the company.

We've assembled a great team and hope that we can provide assistance and support to you in the future. If you've got time, I'd be delighted to show you around our new offices. Until then, all the best.

Sincerely,
Neil

ExecutiveAction
1300 Conn. Ave., NW #501
Washington, DC 20036
(202) 223-4888 - phone
(202) 223-3606 - fax

Ex. 3

**FILED**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MAR **3 0** 2007

NANCY MAYER WHITTINGTON, **CLERK**
U.S. DISTRICT COURT

**GLOBALOPTIONS, INC.,**
**75 Rockefeller Plaza,**
**27th Floor,**
**New York, NY 10019,**

      **Plaintiff,**

        v.

**NEIL LIVINGSTONE**
**700 New Hampshire Avenue, N.W.**
**Washington, D.C. 20037,**

      **Defendant.**

Case: 1:07-cv-00608
Assigned To : Friedman, Paul L.
Assign. Date : 3/30/2007
Description: GLOBAL OPTIONS V. LIVINGSTONE

**CERTIFICATE OF NOTICE PURSUANT TO LOCAL RULE 65.1**

      Counsel for plaintiff GlobalOptions, Inc., pursuant to Local Rule 65.1, certifies as

follows:

1. The time of making the application for a temporary restraining order is 3 pm on

    March 30, 2007.

2. Copies of all pleadings and papers filed in the action to date or to be presented

    to the court at the hearing, have been furnished to the adverse parties by hand-delivery

    service on defendant Neil Livingstone, ExecutiveAction, 1300 Connecticut Avenue,

    N.W., Washington, D.C.  20036.

Respectfully submitted,

Brian W. Shaughnessy, DC 89946
913 M Street, N.W.
Suite 101
Washington, D.C. 20001
(202) 842-1700

Attorney for Plaintiff
GlobalOptions, Inc.