UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GLOBAL OPTIONS INC.,                           :
                                               :
        Plaintiff,                             :
                                               :
                v.                             :        1:07-cv-00608 (PLF)
                                               :
NEIL LIVINGSTONE,                              :
                                               :
        Defendant.                             :
_____      :

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Dated: April 23, 2007                    Respectfully Submitted,

                                         HEIDEMAN NUDELMAN
                                          & KALIK, P.C.
                                         1146 19th Street, N.W., Fifth Floor
                                         Washington, DC 20036
                                         Telephone: 202-463-1818
                                         Facsimile: 202-463-2999

                                         By: _/s/ Tracy Reichman Kalik_____
                                            Richard D. Heideman (No. 377462)
                                            Noel J. Nudelman (No. 449969)
                                            Tracy Reichman Kalik (No. 462055)

# TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND…………………………………………………………..1

LEGAL STANDARD…………………………………………………………..5

ARGUMENT………………………………………………………………...6

I.   THE PLAINTIFF WILL NOT SUCCEED ON THE MERITS OF ITS
     COMPLAINT……………………………………………………………6

     A. The Covenant Not to Compete is Not Limited in Scope or Geography…………...7

     B. Mr. Livingstone has Not Solicited any Current or Previous Clients
        of the Plaintiff ……………………………………………………………9

II.  THE PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE INJURY
     NECESSARY FOR THE ISSUANCE OF A PRELIMINARY INJUNCTION…….11

     A.  Irreparable Injury Has Not Been Established…………………………………11

     B.  Defamation has not been Established…………………………………………13

III. THE BALANCE OF HARDSHIPS WEIGHS IN FAVOR OF
     THE DEFENDANT…………………………………………………………14

IV.  PUBLIC INTEREST WEIGHS AGAINST ENTERING A PRELIMINARY
     INJUNCTION…………………………………………………………..16

V.   THE MOTION FOR PRELIMINARY INJUNCTION SHOULD BE DENIED
     AS IT WAS NOT PROPERLY SERVED ON MR. LIVINGSTONE………………16

CONCLUSION……………………………………………………………..18

APPENDIX

Declaration of Neil Livingstone

Excerpts of the 10KSB of GlobalOptions Group, Inc. filed April 2, 2007

Declaration of Jill Horowitz

## TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*American Coastal Line Joint Venture, Inc. v. United States Lines, Inc.,*
   580 F.supp.932 (D.D.C. 1983)……………………………………………………11

*BPA Intern, Inc. v. Kingdom of Sweden,* 281 F.Supp.2d 73 (D.D.C. 2003)……………..17

*Byrd v. District of Columbia*, 230 F.R.D. 56, (D.D.C. 2005) …………………………...17

*Chaplaincy of Full Gospel Churches v. England***,** 454 F.3d 290 (D.C. 2006)……………6

*City Fed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738 (D.C. Cir. 1995)……....6

*City of Moundridge v. Exxon Mobil Corp.,* 429 F.Supp.2d 117 (D.D.C. 2006)…………16

*Containers Ltc. v. Stena AB,* 890 F.2d 1205 (D.C. Cir. 1989)…………………………...12

*Deutsch v. Barsky,* 795 A.2d 669(D.C. 2002)………………………………………………7

*Dorfman v. Boozer,* 414 F.2d 1168(D.C. Cir. 1969)………………………………………...5

*Ellis v. Hurson Assoc., Inc.* 565 A.2d 615 (D.C. 1989)……………………………………..7

*Erikson v. Hawley,* 56 App.D.C. 268, 271 12 F.2d 491 (D.C. 1926)……………………..7

*Experience Works, Inc. v. Chao,* 267 F.Supp.2d 93 (D.D.C. 2003)………………………5

*Farrington v. Bureau of Nat. Affairs, Inc.,* 596 A.2d 58 (D.C. 1991)…………………...13

*Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d. 1222 (7th Cir. 1993)…………………………...14

*Katz v. Georgetown University,* 246 F. 3d 685 (D.C. Cir. 2001)…………………………6

*LSJ Inv. Co. v. O.L.D., Inc.,* 167 F.3d 320 (6th Cir. 1999)………………………………17

*Magee v. Greenspan,* 808 F.Supp 847 (D.D.C 1991)……………………………………6, 7

*Moldea v. New York Times*, 15 F.3d 1137 (D.C.Cir. 1994)……………………………...13

*Population Inst. v. McPherson*, 797 F.2d 1062 (D.C. 1986)……………………………..6

*Sampson v. Murray,* 415 U.S. 61, 94 S.Ct. 927, 39 L.Ed.2d 166 (1974)…………………6

*Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921 (D.D.C. Cir. 1958)………………..12

**Cases cont'd**                                                              **Page(s)**

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990)…………………….13

*Whitehead v. CBS/Viacom, Inc.*, 221 F.R.D. 1 (D.D.C. 2004) …………………………17

*Wisc. Gas Co. v. FERC,* 758 F.2d 669 (D.C. Cir. 1985)………………………………...12

*Zen Music Inc, v. CVS Corp.* 1998 WL 91202 (S.D.N.Y. 1998)………………………...17

**Rules**

Fed. R. Civ. P. 4(e)(2)………………………………………………………………………16

**Other**

Restatement (Second) of Contracts, Introductory Note to Topic 2: Restraint of Trade, §186 (1981)………………………………………………………………………...7

COMES NOW the Defendant, by and through counsel, and for his opposition to Plaintiff's motion for a Preliminary Injunction states as follows:

## **FACTUAL BACKGROUND**

In 1998, Defendant, Neil Livingstone ("Defendant" or "Mr. Livingstone"), founded GlobalOptions, LLC [1]("GO") as a security and investigations firm in Washington, D.C. See Declaration of Neil Livingstone attached hereto as Exhibit A.  Mr Livingstone was a significant shareholder, and served as an officerr of GO from said date until his departure from GO on January 31, 2007. Exhibit A.  Mr. Livingstone has spent more than two decades advising clients on security related issues including prevention of industrial espionage, internal investigation, protecting intellectual properties, protection of high profile clientele and recovery of hostage and kidnap victims. Exhibit A.

During the Defendant's tenure at GO, GO became public company, and enjoyed significant growth in revenues and profits.  Exhibit A.  In its 10KSB filed on April 2, 2007, GO indicated that as of March 28, 2007, it had 383 full-time and 52 part time employees (p.11) and for the year ended December 31, 2006 had experienced an increase in revenues of approximately $52,895,00 (586%) from the calendar year ending December 31, 2005 (p. 21).  See excerpts of the 10KSB filed on April 2, 2007 by GO and attached hereto as Exhibit B.

GO, in its 10KSB, stated that it provides ". . .high-end risk mitigation services to Fortune 500 corporations, governmental organizations and high-profile individuals throughout the world.  Our risk mitigation services currently include risk management

---

[1] GlobalOptions, LLC was later reorganized into a Delaware corporation and became known as GlobalOptions, Inc.

and security, investigations and litigation support, and crisis management and corporate governance." . . . "Our overall mission is to identify, evaluate, assess and prevent issues that may threaten people, organizations or strategic initiatives for companies and governments around the globe." Exhibit B, p.1.  Further, in the Legal Proceedings section of the 10KSB, GO states that "The Company does not believe that it is involved in any litigation that is likely, individually or in the aggregate, to have material adverse effect on its consolidated financial condition or results of operations or cash flows."  Exhibit B, p. 17.

In October, 2006, Mr. Livingstone met with Harvey Schiller ("Mr. Schiller"), Chairman of GO, in New York City at GO's headquarters. Exhibit A.  The meeting was also attended by Andrew Kaslow of QuanStar, a former HR Director at a major corporation. Exhibit A.  Mr. Schiller and Mr. Livingstone agreed that Mr. Livingstone's Engagement Agreement[2], which expired on Jan. 31, 2007, would not be renewed or extended.  Exhibit A. This was the culmination of more than a year long deterioration of the relationship between Mr. Schiller and Mr. Livingstone over significant differences about the direction and management of GO. Exhibit A.

During that meeting, Mr. Livingstone was also informed by Mr. Schiller that GO would be in touch with him shortly to work out an appropriate transition. Exhibit A. GO's CFO, Jeff Nyweide, subsequently communicated with Mr. Livingstone and advised him that Mort Taubman, the company's outside legal counsel, ("Mr. Taubman") would meet with Mr. Livingstone to negotiate the transition.  Exhibit A.

---

[2] On or about January 24, 2002 Mr.  Livingstone and GO entered into an Employment Agreement ("Employment Agreement").

Mr. Livingstone subsequently met with Mr. Taubman. It was understood that in lieu of receiving a severance package and bonus Mr. Livingstone would proceed to open a new firm in Washington, D.C. Exhibit A. It was understood that the new firm would provide the same services which Mr. Livingstone provided at GO, after all, these were the same services Mr. Livingstone had provided for several decades. Exhibit A. Mr. Taubman advised Mr. Livingstone that that was agreeable but cautioned Mr. Livingstone that he could not solicit either employees or clients of GO. Exhibit A. Mr. Livingstone agreed, but they spoke candidly about the fact that nothing precludes clients or employees from soliciting Mr. Livingstone, since neither a company nor a professional services firm can tell a client who it can or cannot hire. Exhibit A. The parties agreed and they proceeded to the preparation of a letter transition agreement with the mutual understanding that Mr. Livingstone would be opening up his own firm in Washington, DC. Exhibit A.

The meetings with GO and Mr. Taubman were most cordial and done without rancor or serious disagreement. During these many discussions, issues such as, but not limited to, the following were discussed and various understandings and agreement were reached: (1) the timing of Mr. Livingstone's departure; (2) the issue a of a public announcement about Mr. Livingstone's departure; (3) Mr. Livingstone setting up his own firm, (which was established in 2007 by Mr. Livingstone and others and is known as ExecutiveAction, LLC ("EA")); (4) Mr. Livingstone providing continued services to client's of GO; (5) GO providing services to clients of EA; (6) which current GO client's would become clients of Mr. Livingstone's new company, EA; and (7) EA subcontracting and/or referring business to GO. Exhibit A. It was clearly acknowledged that many of Mr. Livingstone's clients at GO would want Mr. Livingstone to continue to

represent them, considering Mr. Livingstone's expertise, the relationships with the clients, and the fact that without Mr. Livingstone, GO would not have been able to fully service some of the clients brought to GO by Mr. Livingstone.  It was further agreed that Mr. Livingstone would seek business to be done jointly by EA and GO.  Exhibit A.

Regarding clients, since it was understood that Mr. Livingstone would continue to offer many of the same services he had before, Mr. Livingstone agreed that Tom Ondeck, ("Mr. Ondek") Mr. Livingstone's former deputy and successor at GO, and Mr. Livingstone would work out which clients would come with Mr. Livingstone to his new firm and which should remain at GO.  Exhibit A.  Mr. Ondeck and Mr. Livingstone subsequently met and a list was prepared.  See Exhibit 1 to Exhibit A.  One client, Project M, was deliberately left off the list because of sensitivities surrounding the client, and Mr. Ondeck and Mr. Livingstone agreed they would continue to work together if the client wanted to continue retaining their services.  Exhibit A.

Pursuant to the Transition Agreement[3], GO was to have prepared a mutually agreeable press release about Mr. Livingstone's transition and departure from GO. They failed to do that.  Exhibit A.  Accordingly, in light of GO's failure, Mr. Livingstone found it necessary to send out his own announcement letter advising of his departure from GO to his Contact List.  GO specifically approved Mr. Livingstone's contact list being released to Mr. Livingstone as it was his property.  Exhibit A and Declaration of Jill Horowitz, attached hereto as Exhibit C.  Cognizant not to solicit clients of GO, Mr. Livingstone had his Contact List printed and carefully went through it, making a list by

---

[3] On or about October 16, 2006, Mr. Schiller on behalf of GO and Mr. Livingstone executed a letter agreement setting forth certain of the understandings and agreements reached between GO and Mr. Livingstone regarding his departure from GO. ("Transition Agreement")   The Transition Agreement is attached as Exhibit 2 to the Declaration of Harvey Schiller.

hand for his assistant, Jill Horowitz, as to which people should receive either letter A or letter B. Exhibit A, Exhibit C. The difference in the two letters was the nature of the language used, one being solicitous and the other not. The non-solicitous letter was sent to anyone who had previously had a relationship with GO. See Exhibit A, Exhibit C and Exhibits 1 and 2 to Exhibit C.

Mr. Livingstone has upheld his side of the agreement with absolute fidelity. He has not knowingly "solicited" a single client and, in the past three months not only refrained from doing so, but EA has written checks to GO in the amount of $1,415,000, using them as a subcontractor in accordance with the understandings reached. See Exhibit 2 to Exhibit A. It was absolutely understood that Mr. Livingstone would solicit new business which would be subcontracted out or referred to GO. Exhibit A. In further support of this, Mr. Livingstone recently received a letter from Jeff Nyweide welcoming him to GO's Senior Advisory Board and offering Mr. Livingstone stock options. Exhibit A.

Until the filing of the pending lawsuit, Mr. Livingstone was unaware that GO believed that he was in violation of any written or oral understanding with them, related to the transition as he believed he was acting consistent with matters agreed to with GO. Exhibit A.

## **LEGAL STANDARD**

It is undisputed that the granting of preliminary injunctive relief is an extraordinary measure. *Experience Works, Inc. v. Chao,* 267 F.Supp.2d 93, 96 (D.D.C. 2003). Accordingly, the power to issue such exceptional relief "should be 'sparingly exercised.' " *Dorfman v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969). The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a

trial on the merits can be held. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. 2006).

To obtain preliminary injunctive relief, a plaintiff has the burden of demonstrating: "1) a substantial likelihood of success on the merits; 2) that [plaintiff] would suffer irreparable injury if the injunction is not granted; 3) that any injunction would not substantially injure other interested parties; and 4) that the public interest would be served by the injunction." *Katz v. Georgetown University*, 246 F. 3d 685, 687-88 (D.C. Cir. 2001). A district court must "balance the strengths of the requesting party's arguments in each of the four required areas." *City Fed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). Accordingly, the Court must consider each of these factors when weighing the possibility of entering the extreme measure of awarding a preliminary injunction.

Of particular importance is that the movant must demonstrate "at least some injury" for a preliminary injunction to issue. *Id.* (quoting *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. 1986)). "The basis of injunctive relief in the federal courts has always been irreparable harm," *Sampson v. Murray*, 415 U.S. 61, 88, 94 S.Ct. 927, 39 L.Ed.2d 166 (1974).

## **ARGUMENT**

## I.    **THE PLAINTIFF WILL NOT SUCCEED ON THE MERITS OF ITS COMPLAINT.**

First and foremost, this Court should deny Plaintiff's motion for a Preliminary Injunction because Plaintiff cannot demonstrate that it will have a substantial likelihood of success on the merits of its Complaint. To obtain preliminary injunction, plaintiff is required to make a strong showing that plaintiff is likely to succeed on the merits. *Magee*

*v. Greenspan,* 808 F.Supp 847 (D.D.C 1991).  Plaintiff cannot demonstrate such a showing.

Plaintiff bases its Complaint on the argument that there was a valid and enforceable Non-Competition Clause in force and effect when, by mutual agreement, Mr. Livingstone left GO.  However, when examining the multiple prong non-competition clause which Defendant relies on, the Court will find it is unenforceable as it is vague, overbroad, not limited in scope or geography, and is an unreasonable restraint on trade. *Ellis v. Hurson Assoc., Inc.* 565 A.2d 615, 618 (D.C. 1989).  When a restriction is not limited in time and territory, and where great hardship would be placed on the employee who was leaving, the restrictive covenant would be invalidated.  *Deutsch v. Barsky*, 795 A.2d 669, 674 (D.C. 2002)(*citing Erikson v. Hawley*, 56 App.D.C. 268, 271 12 F.2d 491, 494 (D.C. 1926))  Furthermore, a promise not to compete is unenforceable on the grounds of public policy if it is an unreasonable restraint on trade.  *Ellis* at 618 *citing* Restatement (Second) of Contracts, Introductory Note to Topic 2: Restraint of Trade, §186 (1981).  The Restatement explains that a promise not to compete is "a restraint of trade if its performance would…restrict the promisor in the exercise of gainful occupation."  *Id.*  Here, the restriction that GO seeks to enforce in its general non-competition clause is not limited in scope or in geographic territory.  Moreover, it is a restraint of trade as it seeks to restrict Mr. Livingstone from gainful occupation, and therefore is violative of public policy.

A.  The Covenant Not to Compete is Not Limited in Scope or Geography

The covenant not to compete that GO relies on is contained in Section 6.1 of the January 2002 Employment Agreement executed by Mr. Livingstone.  (See Exhibit 1 to

the Declaration of Harvey Schiller attached in support of Plaintiff's Motion for a

Temporary Restraining Order.)  The covenant contains three provisions; (a) it limits Mr.

Livingstone from soliciting employees of the GO, (b) it limits Mr. Livingstone from

soliciting clients or customers of GO who were either current customers of GO or had

been clients of GO in the 12 months prior to Mr. Livingstone's departure and (c) it

restricts Mr. Livingstone from rendering **any** services that were provided or contemplated

to be provided by GO (emphasis added).[4]  Notably, the restrictions that GO places on Mr.

Livingstone in the general non-competition clause (Section 6.1(c)) are not limited in their

scope or geography.  In fact they are excessively broad and seem to apply worldwide,

such that the restrictive covenant seems to restrict Mr. Livingstone from engaging in any

form of employment in the broad area of advising clients on **any** security related issue, in

which Mr. Livingstone is a recognized expert.

The Plaintiff argues that Mr. Livingstone has been well compensated in

consideration for this covenant not to compete.  However, Mr. Livingstone did not

receive any severance package or bonus when he departed GO in consideration for

agreeing to leave and start his own company. See Exhibit A.  In fact, Mr. Livingstone has

stated that it was because all parties agreed and understood that he would be opening his

own consulting business in the areas of decision support and business solutions, that

neither severance, nor a bonus would be paid.  Exhibit A.  Mr. Livingstone made this

decision, with the support of GO.  Exhibit A.   As evidenced by the Transition

Agreement issued and subsequent conversations that Mr. Livingstone had with various

GO executives and consultants, GO was aware and supportive of Mr. Livingstone's plans

---

[4] In reviewing Plaintiff's Complaint, it does not appear that Plaintiff is alleging that Mr. Livingstone violated Section 6.1(a) of the Employment Agreement pertaining to the solicitation of GO employees, rather the Complaint alleges that Mr. Livingstone violated provisions (b) and (c).

to immediately open his own firm and continue to earn a living based on his well-known expertise in various business solution areas. Exhibit A. Moreover, the stock and stock options that Mr. Livingstone retained, were not offered to compensate Mr. Livingstone for his inability to earn a living during this so 12 month period, but rather were reflective of Mr. Livingstone's initial and continued investment in and years of contribution and excellent services to GO.  All parties agreed that because Mr. Livingstone would be operating a business that in many ways would compliment the services that GO offered, and Mr. Livingstone would do his best to even refer business when appropriate to GO. See Exhibit A. The parties even discussed which clients would move with Mr. Livingstone to his new start-up business, as it was clear to all parties that certain clients would need to be continued to be serviced primarily by Mr. Livingstone.  See Exhibit A. Thus, it is clear from the actions and discussions that both Mr. Livingstone had with GO executives and consultants that all parties envisioned that Mr. Livingstone's new business venture would be started immediately and would attempt to work in conjunction with each other to maximize the services that each could provide to service all potential clients.  In fact, even after the filing of this lawsuit, GO has asked Mr. Livingstone to serve on the Senior Advisory Board to GlobalOptions Group, such that Mr. Livingstone, through his new company, ExecutiveAction, can continue to work with GO on various business endeavors. See Exhibit A.

   B.  Mr. Livingstone has Not Solicited any Current or Previous Clients of the Plaintiff.

        Although it remains Mr. Livingstone's position that non-solicitation of customers provision of the non-compete clause (Section 6.1(b)) should be invalidated by the Court because it is overly restrictive restraint on trade, Mr. Livingstone  disputes that he

solicited any clients[5] of GO.    In fact, Mr. Livingstone has been scrupulous in attempting

not to solicit any of GO's clients, despite the fact that the Plaintiff has clearly breached its

obligations to Mr. Livingstone to advise the public, including clients of GO of his

departure from the Company.  See Exhibit A.

On October 16, 2006, Mr. Schiller issued to Mr. Livingstone the Transition

Agreement which outlined each parties responsibilities relative to the impending

departure of Mr. Livingstone from GO.  The very first provision of the Transition

Agreement states that the Company would work with its public relations consultants to

develop and issue a press release to advise the public of Mr. Livingstone's intended

departure from GO.  Despite this promise to Mr. Livingstone's knowledge, no press

release was ever issued, such that Mr. Livingstone was left in the position of having no

ability to advise the public at large of his departure.  Accordingly, many of Mr.

Livingstone's contacts (most of whom weren't and had never had been clients of GO)

were afforded no opportunity to learn of his departure from the Plaintiff.  See Exhibit A.

Mr. Livingstone requested that Plaintiff draft and issue the promised press release,

but his requests were ignored. See Exhibit A.  Accordingly, when Mr. Livingstone

departed GO in the fall of 2006, most people had no idea how to reach Mr. Livingstone

and GO did not provide them with this information.  Mr. Livingstone continued to

request that notice go out, but after more than three (3) months had passed since Mr.

Livingstone had departed GO, and still no notice had been given, Mr. Livingstone felt

that he had no choice but to issue notice and advise his contacts on his own.  Exhibit A.

Accordingly, in March 2007 Mr. Livingstone began to draft and issue personal letters to

---

[5] Section 6.1(b) defines "clients" as firms or agencies which GO or any affiliate of GO provided services or
sold products within twelve (12) months prior to the date of the termination of the Employee's employment

his contacts to advise them of his departure from GO.  See Exhibit A, Exhibit C.  In

drafting his letters, Mr. Livingstone was meticulous.  In one letter, which he sent to both

current clients and previous clients of GO he merely informed them of his departure from

GO, the reasons why, and his formation of Executive Action, LLC.  He did not in anyway

offer to provide assistance or support to these clients.  See Exhibit A, Exhibit C, and

Exhibit 1 to Exhibit C.  The other letter, which was sent to the majority of the list and

which were not clients (either current or previous) of GO, received essentially the same

letter but included a sentence that stated that Mr. Livingstone hoped he could be of

assistance to them in the future. See Exhibit A, Exhibit C and Exhibit 2 to Exhibit C.  It is

clear that by his drafting and his transmittal of two separate and distinct letters, it was Mr.

Livingstone's intent and purpose not to solicit GO clients.  If by some chance an error

was made and a client of GO received the letter attached as Exhibit 2 to Exhibit C there

was no intent by Mr. Livingstone to solicit these clients and there could only be a relative

few number of these letters issued in error.   Accordingly, the Plaintiff cannot

demonstrate the irreparable injury caused by this inadvertent error, which is an essential

element the Plaintiff must establish in order to meet its burden in this case.

II.    **THE PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE INJURY NECESSARY FOR THE ISSUANCE OF A PRELIMINARY INJUNCTION**.

   A.  Irreparable Injury Has Not Been Established.

      "Irreparability of injury is a very high standard."  *American Coastal Line Joint*

*Venture, Inc. v. United States Lines, Inc.,* 580 F.supp.932, 936 (D.D.C. 1983). A movant's

failure to show any irreparable harm is therefore grounds for refusing to issue a

preliminary injunction, even if the other three factors entering the calculus merit such

11

relief. *See, e.g., See Containers Ltc. v. Stena AB,* 890 F.2d 1205, 1210-11 (D.C. Cir.

1989).  In order to establish an irreparable injury, first the plaintiff must establish that the

injury is both "certain and great; it must be actual and not theoretical." *Wisc. Gas Co. v.

FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). The moving party must show

"[t]he injury complained of is of such *imminence* that there is a 'clear and present' need

for equitable relief to prevent irreparable harm." *Id.*. Second, the injury must be beyond

remediation. "Mere injuries, however substantial, in terms of money, time and energy

necessarily expended in the absence of a stay are not enough. The possibility that

adequate compensatory or other corrective relief will be available at a later date, in the

ordinary course of litigation weighs heavily against a claim of irreparable harm.  *Va.

Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.D.C. Cir. 1958).  Here, Plaintiff

has not demonstrated the requisite irreparable injury, nor can it do so under the facts of

this matter.

       In his declaration, Mr. Schiller has not alleged that Plaintiff has lost any clients

nor suffered any monetary losses whatsoever as a result of Mr. Livingstone's alleged

violations of his Non-Compete Agreement.  Moreover, in its recent 10KSB filing filed

with the Securities and Exchange Commission on April 2, 2007 (after the filing of its

Complaint and Motion for Preliminary Injunction), GO represented to the SEC and its

shareholders that it had an increase in revenues of approximately $52,895,000 (586%)

from the calendar year ending December 31, 2005 and that its expected economic

forecast was very favorable. See Exhibit B.

       Moreover, in "Item 3. Legal Proceedings" in its 10KSB, GO indicated that "[t]he

Company does not believe that it is involved in any litigation that is likely, individually

or in the aggregate, to have material adverse effect on its consolidated financial condition or results of operations or cash flows." (Emphasis added.) Exhibit B.  As set forth, *supra*, GO's 10KSB was filed on April 2, 2007, days after the initiation of the Plaintiff's Motion for Preliminary Injunction and their Complaint.  Accordingly, the Plaintiff's in its own SEC filings has acknowledged and admitted that it has not suffered any material damage as a result of Mr. Livingstone's alleged breaches as the Plaintiff surely would have to disclose that if it lost the pending Preliminary Injunction and related Complaint against Mr. Livingstone, it was going to suffer irreparable harm and damage. See Exhibit B. Therefore, Plaintiff has not demonstrated any actual damage that has resulted from Mr. Livingstone's start-up of his business ExecutiveAction, LLC, nor any damage that it has suffered as a direct result of the announcement letters that Mr. Livingstone sent out.  In fact, to the contrary, GO has materially benefited from Mr. Livingstone's business at ExecutiveAction, LLC.  As result of his continued ability to service clients, Mr. Livingstone was able to refer and subcontract work to GO (as anticipated in the Transition Agreement) and since January 2007, has paid GO in excess of $1.4 million. Exhibit A, and Exhibit 2 attached to Exhibit A.

  B.  <u>Defamation has not been Established.</u>

    With regard to Plaintiff's claim that it was somehow "defamed" by Mr. Livingstone's letters to his contacts, it is well settled that "truth is a complete defense to a claim of defamation".  *Farrington v. Bureau of Nat. Affairs, Inc.,* 596 A.2d 58, 59 (D.C. 1991).  In addition, assertion of an opinion, as long as it is not based on defamatory facts, is also a defense to a claim of defamation.  *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990); *Moldea v. New York Times*, 15 F.3d 1137, 1144 (D.C.Cir.

1994).  When a writer gives a statement of opinion that is based upon *true* facts, such opinions generally are not actionable so long as the opinion does not otherwise imply unstated defamatory facts.  The Seventh Circuit has explained this further to mean that "[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise …the statement is not actionable." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d. 1222, 1227 (7th Cir. 1993). *Id.*   Finally, it is unquestionable that the First Amendment protects Mr. Livingstone's right to proffer his opinion.

In his announcement letters advising his contacts of his departure from GO, Mr. Livingstone felt it necessary to state his reasons for leaving.  His letter merely stated that it was his opinion that he did not like the bureaucracy and necessary disclosures that came with operating a public company.  Nowhere does he state or even imply that GO was acting improperly in making these disclosures.  Rather Mr. Livingstone made the truthful statement that certain reporting and disclosures must be made when one operates a public company[6],  and that it was his opinion that he was not comfortable operating within the confines of a public company and therefore he believed that he would best be able to service clients in a non public company.  Accordingly, there was nothing defamatory in Mr. Livingstone's notice letters and therefore, GO cannot claim to have suffered irreparable harm as a result of Mr. Livingstone having sent them.

III.   **THE BALANCE OF HARDSHIPS WEIGHS IN FAVOR OF THE DEFENDANT**

The Plaintiff has argued that the balance of hardships weighs in its favor, but this is clearly not the case.  The Plaintiff is a multi-million dollar publicly held corporation. As of March 28, 2007, GO had 383 full-time and 52 part time employees.  See Exhibit B.

---

[6] As evidenced by the necessary 10KSB filings of GO

For the year ended December 31, 2006, GO had experienced an increase in revenues of approximately $52,895,000 (586%) from the calendar year ending December 31, 2005. Exhibit B. The Defendant is a start-up LLC, with less than 10 partners and employees. Exhibit A. GlobalOptions, Inc is a worldwide high-end risk mitigation corporation providing a wide arrange of services to many different types of clients. See Exhibit B. Nothing that Mr. Livingstone has done or said has put any of GO operations at risk, and if anything, Mr. Livingstone has continued to work to bolster the Plaintiff's position in the high-end security industry by continuing to refer and subcontract work to GO, exactly as he agreed to do.   Exhibit A.

However, if this Court were to enter a preliminary injunction against Mr. Livingstone, he would suffer severe hardship. He would be unable to earn a living, and support the few employees he has retained on behalf of ExecutiveAction, LLC. Exhibit A. Moreover, although he has a considerable number of contacts and an impeccable reputation in the business world, if this Court were to restrict his ability to communicate and serve these contacts over the next 9 months, EA would lose considerable opportunities to solidify its start-up business, which GO knew and agreed that Mr. Livingstone would establish. Moreover, these contacts would be denied the ability to access Mr. Livingstone's considerable expertise in addressing their difficult business solution problems, matters which GO does not and cannot handle for these particular clients. Accordingly, as it clear that Mr. Livingstone and EA would certainly suffer significant hardship if this Court were to enter a preliminary injunction on the basis of what can be characterized at best, a tenuous Non-Competition Agreement modified by

the transition Agreement and other understandings of the parties, this Court should deny the Plaintiff's Motion for Preliminary Injunction.

## IV.    PUBLIC INTEREST WEIGHS AGAINST ENTERING A PRELIMINARY INJUNCTION.

This Court should also deny Plaintiff's Motion for a Preliminary Injunction as public interest weighs in favor against entering preliminary injunctions.  The public interest is generally not served by restraining people from pursuing gainful employment. When considering whether the public interest will be furthered by an injunction the Court must consider the broad public interest. *City of Moundridge v. Exxon Mobil Corp.,* 429 F.Supp.2d 117, 137 (D.D.C. 2006).  Here, there is no broad public interest served by issuing a preliminary injunction to enforce the non-competition clause, and therefore this factor does not weigh in the Plaintiff's favor.  Accordingly, this Court should deny Plaintiff's Motion for a Preliminary Injunction.

## V.    THE MOTION FOR PRELIMINARY INJUNCTION SHOULD BE DENIED AS IT WAS NOT PROPERLY SERVED ON MR. LIVINGSTONE.

The Motion for Preliminary Injunction and the Complaint in this action were not personally served on Mr. Livingstone, nor delivered to his dwelling house, nor originally delivered to an agent of Mr. Livingstone that Mr. Livingstone authorized to receive service.[7]  Mr. Livingstone was sued in his individual capacity.  Accordingly, Fed. R. Civ. P. 4(e)(2) prescribes that service must be made,

---

[7] Originally Mr. Livingstone was not requested to waive service of process nor did he appoint an agent to receive process on his behalf.  After retaining counsel, Mr. Livingstone's counsel advised counsel for the Plaintiff that he did not believe the Plaintiff had properly served Mr. Livingstone.  Mr. Livingstone then authorized his counsel to receive service on his behalf.  On April 19, 2007 the Plaintiff re-served the original Summons, Complaint, Motion for Preliminary Injunction and Motion for Temporary Restraining Order (which has already been denied) on Mr. Livingstone's counsel.  It is Defendant's position that because the Motion for Preliminary Injunction was originally not properly served, this Court has grounds to

by delivering a copy of the summons and of the complaint to the individual personally or by leaving copies thereof at the individual's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein or delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process.

The Plaintiff purports to have served Mr. Livingstone by having a courier deliver its Summons, Complaint, and preliminary motions to Mr. Livingstone.  (See Plaintiff's Certificate of Notice Pursuant to Local Rule 65.1.)  However, the Plaintiff erred in its representations to the Court in its 65.1 Notice.  The papers referenced were not "hand-delivered" to Mr. Livingstone, rather in truth they were left at Mr. Livingstone's office, and given to an employee of EA, at a time when Mr. Livingstone was not even in his office. See Exhibit A. Without having the benefit of being able to consult with counsel, Mr. Livingstone did appear at a telephone conference with the Court, but because the telephonic hearing was held in an emergency manner, he was unaware that he could challenge the means by which he received service of these papers, and does not waive his objection thereto.

It is established that "notice alone cannot cure an otherwise defective service." *Byrd v. District of Columbia*, 230 F.R.D. 56, 59 n.4 (D.D.C. 2005)(citing *Whitehead v. CBS/Viacom, Inc.*, 221 F.R.D.1, 4 (D.D.C. 2004)  citing *Zen Music Inc, v. CVS Corp.* 1998 WL 91202 at *2(S.D.N.Y. 1998)); *See also LSJ Inv. Co. v. O.L.D., Inc.,* 167 F.3d 320, 322 (6th Cir. 1999) ("actual knowledge cannot take the place of legally sufficient service"); *BPA Intern, Inc. v. Kingdom of Sweden,* 281 F.Supp.2d 73, 84 (D.D.C. 2003).

---

deny the motion.  Moreover, it is Defendant's position that with regard to the Summons and Complaint filed by the Plaintiff, they were not properly served until April 19, 2007 and therefore the time for answering and/or otherwise pleading to said Complaint did not begin to run until then and therefore, Mr. Livingstone's responsive pleading is not due until at the earliest, May 9, 2007.

Accordingly, as Mr. Livingstone has not been properly served, this Court should deny Plaintiff's Motion for Preliminary Injunction.

## CONCLUSION

WHEREFORE, for the reasons stated above and for those to be set forth more fully at the hearing scheduled to be held on April 24, 2007 at 10:00 a.m. before this Court, Defendant respectfully requests that this Court deny Plaintiff's Motion for Preliminary Injunction.

Dated: April 23, 2007                    Respectfully Submitted,

HEIDEMAN NUDELMAN
& KALIK, P.C.
1146 19th Street, N.W., Fifth Floor
Washington, DC 20036
Telephone: 202-463-1818
Facsimile: 202-463-2999

By: _/s/ Tracy Reichman Kalik_____
Richard D. Heideman (No. 377462)
Noel J. Nudelman (No. 449969)
Tracy Reichman Kalik (No. 462055)

## CERTIFICATE OF SERVICE

I hereby certify that on this the 23rd day of April, 2007 a copy of the forgoing was served via the ECF filing system of the United States District Court for the District of Columbia on counsel for the Defendant:

Brian W. Shaughnessy, Esq.
913 M Street, NW
Suite 101
Washington, DC  20001

_/s/Tracy Reichman Kalik___
Tracy Reichman Kalik

18

# EXHIBIT B

# Excerpts of 10KSB of GlobalOptions Group, Inc. filed April 2, 2007



Print Page    Close Window

**SEC Filings**

**10KSB**

GlobalOptions Group, Inc. filed this Form 10KSB on 04/02/07

<< Previous Page | Next Page >>

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-KSB**

(Mark One)

☒    ANNUAL REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE OF 1934

For the Fiscal Year Ended December 31, 2006

☐    TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE EXCHANGE ACT

For the transition period from _____ to _____

Commission file number: 333-136468

**GLOBALOPTIONS GROUP, INC**
(Name of Small Business Issuer in Its Charter)

| Delaware | 73-1703260 |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

75 Rockefeller Plaza, 27th Floor
New York, New York
(Address of Principal Executive Offices)

10019
(Zip Code)

Issuer's telephone number, including area code: (212) 445-6262

_____

(Former name and former address, if changed since last report)

Securities registered under Section 12(b) of the Exchange Act: None

Securities registered under Section 12 (g) of the Exchange Act: None

Check whether the issuer is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act: ☐

Check whether the issuer (1) filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☒ No ☐

Check if there is no disclosure of delinquent filers in response to Item 405 of Regulation S-B contained herein, and no disclosure will be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference to Part III of this Form 10-KSB or any amendment to this Form 10-KSB. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b 2 of the Exchange Act (Check one):
Yes ☐ No ☒

State issuer's revenues for its most recent fiscal year: $61,924,000

Aggregate market value of the voting common stock held by non-affiliates based on the weighted average bid and asked price of such common stock on March 7, 2007: $24,009,410.

As of March 28, 2007, there were 2,984,514 shares of the issuer's common equity outstanding.

Transitional Small Business Disclosure Format (Check one): Yes ☐ No ☒

# GLOBALOPTIONS GROUP, INC. AND SUBSIDIARIES
**Form 10-KSB**
**December 31, 2006**
**TABLE OF CONTENTS**

| | |
|---|---|
| PART I | 1 |
| FORWARD-LOOKING STATEMENTS | 1 |
| ITEM 1. DESCRIPTION OF BUSINESS | 1 |
| ITEM 2. DESCRIPTION OF PROPERTY | 17 |
| ITEM 3. LEGAL PROCEEDINGS | 17 |
| ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 18 |
| PART II | 19 |
| ITEM 5. MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS | 19 |
| ITEM 6. MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION | 20 |
| ITEM 7. FINANCIAL STATEMENTS | 31 |
| ITEM 8. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 31 |
| ITEM 8A. CONTROLS AND PROCEDURES | 31 |
| ITEM 8B. OTHER INFORMATION | 32 |
| PART III | 33 |
| ITEM 9. DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS, CONTROL PERSONS AND CORPORATE GOVERNANCE; COMPLIANCE WITH SECTION 16(A) OF THE EXCHANGE ACT | 33 |
| ITEM 10. EXECUTIVE COMPENSATION | 38 |
| ITEM 11. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 46 |
| ITEM 12. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 50 |
| ITEM 13. EXHIBITS | 52 |
| ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES | 55 |

PART I

INTRODUCTORY NOTE

FORWARD-LOOKING STATEMENTS

Information included or incorporated by reference in this Annual Report on Form 10-KSB may contain forward-looking statements. This information may involve known and unknown risks, uncertainties and other factors which may cause our actual results, performance or achievements to be materially different from the future results, performance or achievements expressed or implied by any forward-looking statements. Forward-looking statements, which involve assumptions and describe our future plans, strategies and expectations, are generally identifiable by use of the words "may," "should," "expect," "anticipate," "estimate," "believe," "intend" or "project" or the negative of these words or other variations on these words or comparable terminology.

This Annual Report Form 10-KSB contains forward-looking statements, including statements regarding, among other things, (a) our projected sales and profitability, (b) our growth strategies, (c) anticipated trends in our industry, (d) our future financing plans and (e) our anticipated needs for working capital. These statements may be found under "Management's Discussion and Analysis or Plan of Operations" and "Description of Business," as well as in this Annual Report generally. Actual events or results may differ materially from those discussed in forward-looking statements as a result of various factors, including, without limitation, the risks outlined under "Risk Factors" and matters described in this Annual Report generally. In light of these risks and uncertainties, there can be no assurance that the forward-looking statements contained in this Annual Report will in fact occur.

**Item 1. Description of Business**

**Company Overview**

GlobalOptions Group, Inc. through its wholly-owned subsidiaries GlobalOptions, Inc. and The Bode Technology Group, Inc. (which was acquired on February 28, 2007) is a provider of high-end risk mitigation services to Fortune 500 corporations, governmental organizations and high-profile individuals throughout the world. Our risk mitigation services currently include risk management and security, investigations and litigation support, and crisis management and corporate governance. These engagements take our staff around the world and are typically highly sensitive engagements where we interact with senior leaders in both corporations and governments. Our overall mission is to identify, evaluate, assess and prevent issues that may threaten people, organizations or strategic initiatives for companies and governments around the globe.

Our management, staff and advisory boards include security and terrorism experts formerly in the military, former intelligence and law enforcement officers, professional investigators, and legal and crisis communications specialists. We provide services to governments, law firms, private clients and corporations.

We have been awarded "approved" status as a vendor of consulting and related services to United States government agencies by the U.S. General Services Administration (GSA). We are a MOBIS (management, organizational and business improvement services) contractor and members of our staff have high-level security clearances.

1

**Government Regulation**

Due to our participation in government contracts, we will be subject to audit from time to time for our compliance with government regulations by various agencies. Governmental agencies may also periodically conduct inquiries or investigations that may cover a broad range of our activity. Investigator licenses are needed domestically, while surveillance as well as investigator licenses are generally regulated on a state and local level. We believe that we operate our business in material compliance with all applicable federal, state and local government regulations.

**Employees**

As of March 28, 2007, we had 383 full-time and 52 part-time employees, including employees from the acquisitions of CBR, JLWA, Safir, Secure Source, Hyperion Risk, OnLine Consulting, Bode and Facticon. We enjoy good employee relations. None of our employees are members of any labor union, and we are not a party to any collective bargaining agreement.

**Risk Factors**

The following risk factors should be considered carefully in addition to the other information contained in this annual report:

**Risks Related to Our Business and Industry**

*We are an emerging company and have a history of operating losses and uncertain future results of operations.*

We were founded in 1998 and are still in the process of developing our risk mitigation, investigative and global security services. We have incurred significant operating losses since inception, including a cumulative net loss available to common stockholders of approximately $46,800,000 for the years ended December 31, 2006, 2005, and 2004, respectively. We cannot anticipate when or if we will achieve profitability in the future. We may not generate sufficient revenues to meet our expenses or to operate profitably in the future.

*We are a worldwide business and are therefore influenced by factors and regulations in many countries.*

We undertake our business worldwide. The occurrence of any of the following risks could have a materially adverse effect on both the market for our services or our ability to provide them, and/or the profits and services of our clients; as a result, these risks could materially adversely affect the operations and value of any of our services that we offer to overseas clients:

- changes in, and difficulty in complying with, laws and regulations of the different countries including authority to trade or perform the services of a commercial risk mitigation company;

- nullification, modification and renegotiation of contracts;

- reversal of current policies, including favorable tax policies, encouraging foreign investment of foreign trade, or relating to the use of local agents;

- restrictive actions by local governments including tariffs and limitations on imports and exports; and

- difficulty in collecting accounts receivable and longer collection times.

11

### Item 2.  Description of Property

**Facilities**

Until the acquisitions of CBR and JLWA on August 14, 2005 and March 10, 2006, respectively, we were primarily located in two leased facilities. Our operating base located at 1615 L Street, N.W., Suite 300, Washington, D.C. 20036, is comprised of 11,671 square feet leased at a cost of $40,000 per month. Our telephone number there is (202) 293-2490. Our administrative headquarters are located at 75 Rockefeller Plaza, 27th Floor, New York, NY 10019, and is comprised of approximately 1,800 square feet leased at a cost of $7,797 per month. Our telephone number there is (212) 445-6262.

Through the acquisitions of CBR, we assumed the lease to 40 Burton Hills Blvd., Suite 410, Nashville, TN 37215, which is comprised of approximately 1,827 square feet at a cost of $1,979 per month. In addition, we assumed the leases to CBR's branch offices in California, Texas, New Jersey, Illinois, Florida and Michigan.

Through the acquisition of JWLA, we assumed the lease to 701 13th Street NW, Suite 850, Washington, DC 20005, which is comprised of 6,398 square feet at a cost of $27,722 per month. Effective January 2007, the lease in Washington was terminated and the JLWA personnel were relocated to our other local leased facility. In addition, we assumed the leases to JWLA's branch offices in Atlanta, Chicago, Little Rock and Sacramento.

Through the acquisition of Safir, we assumed the lease to 415 Madison Ave., 17th Floor, New York, NY 10017, which is comprised of approximately 8,150 square feet at a cost of $26,772 per month. In addition, we assumed the leases to Safir's branch offices in California, Texas, Illinois and Massachusetts.

Through the acquisitions of Secure Source, we assumed the lease to 710 South Kimball Avenue, Southlake, Texas, which is comprised of approximately 2,510 square feet at a cost of $4,375 per month. In addition, we assumed the leases to the Secure Source branch office in Alexandria, VA.

Through the acquisition of Hyperion, we assumed the lease to 5950 Hazeltine National Drive, Suite 650, Orlando, FL, which is compromised of approximately 7,872 square feet at a cost of $13,100 per month.

Through the acquisition of On Line Consulting, we assumed the lease to 388 17th Street, Suite 230 Oakland, California, which is comprised of approximately 3,071 square feet at a cost of approximately $5,000 per month.

Through the acquisitions of Bode, we assumed the lease 10430 Furnace Road. Suite 107, Lorton, Virginia, which is comprised of approximately 39,000 square feet at a cost of $59,000 per month.

Through our acquisition of Facticon, we did not assume the commitment for any lease obligations.

We have no current intention to invest in real estate or real estate mortgages. We may purchase the common stock of companies, as a means of acquisition, but have no intent to passively hold or invest in the common stock of companies.

### Item 3. Legal Proceedings

From time to time, the Company is involved in litigation arising in the ordinary course of business. The Company does not believe that it is involved in any litigation that is likely, individually or in the aggregate, to have a material adverse effect on its consolidated financial condition or results of operations or cash flows.

17

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion of results of operations and financial condition is based upon, and should be read in conjunction with, our consolidated financial statements and accompanying notes thereto included elsewhere herein.*

### Results of Operations

The following discussion and financial information is presented to aid in understanding our consolidated financial position and results of operations. The emphasis of this discussion will be on the year ended December 31, 2006, as compared to the year ended December 31, 2005.

### Overview

We experienced an increase in revenues of approximately $52,895,000 (586%) and reported an operating loss of approximately $7,453,000 and $3,523,000 and a net loss of $17,846,000 and $3,570,000 for the years ended December 31, 2006 and 2005, respectively. The increase in revenues for the year ended December 31, 2006 is primarily attributable to the full year revenues of CBR and the 2006 acquisitions of JLWA, Safir, Secure Source and Hyperion Risk which during 2006 provided revenues of $6,984,000, $37,556,000, $6,467,000, $1,352,000 and $2,065,000, respectively, offset by a decrease in revenues of $1,529,000 at the GlobalOptions unit.

Although we do have some long-term relationships with our clients, our ability to generate revenue is generally dependent upon obtaining many new projects each year, most of which are relatively short-term. Accordingly, period-to-period comparisons within a given year or between years will need to take this normal fluctuation into consideration.

Our gross profit for the year ended December 31, 2006 was 48% as compared to 44% for the year ended December 31, 2005. The increase in the year ended December 31, 2006 was primarily due to changes in the mix of the types of client engagements, in connection with the recent acquisitions of CBR, JLWA, Safir, Secure Source and Hyperion Risk, with the JLWA unit providing a gross profit of 49%.

Net loss available to common stockholders for the years ended December 31, 2006 and 2005 was $42,259,000 and $4,550,000 respectively, for an increase of $37,709,000 or approximately 829%. The increased net loss was primarily attributable to an impairment loss on goodwill and intangibles of $3,144,000, the amortization of debt discounts of $7,523,000 and amortization of deferred financing costs of $2,695,000 related to our financing programs, as well as to the deemed dividend on Series B convertible preferred stock of $24,413,000.

While the financial results show a significant net loss available to common stockholders for the year ended December 31, 2006, we believe that we represent a unique opportunity to be a profitable global leader in the highly fragmented risk mitigation industry. GlobalOptions Group is an established company that will serve as our nexus for a series of acquisitions that we believe will deliver capabilities, products and services designed to meet the ever increasing demand for the assessment and management of risk. We see no indication that the drivers of increased risk mitigation spending are likely to dissipate any time in the near future. Risk mitigation providers on both the product and services side are still fragmented and ripe for consolidation with no clear market leader or dominant brand. We believe there is an opportunity to provide comprehensive solutions which can drive increased revenues for a company that can build a comprehensive platform. We expect GlobalOptions Group to be that company.

21

# EXHIBIT C

# Declaration of Jill Horowitz

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GLOBAL OPTIONS INC.,                          :
                                              :
        Plaintiff,                            :
                                              :
              v.                              :        1:07-cv-00608 (PLF)
                                              :
NEIL LIVINGSTONE,                             :
                                              :
        Defendant.                            :
                                              :

DECLARATION OF JILL HOROWITZ

        Comes now the Declarant, Jill Horowitz, and declares under penalty of perjury,

based upon her own personal knowledge, as follows:

    1.      My name is Jill Horowitz.  I am the Vice President of Operations for

            ExecutiveAction, LLC (hereinafter "ExecutiveAction").  Prior to

            working for Executive Action, I was the Executive Assistant for Neil

            Livingstone at Global Options, Inc., (hereinafter "GO").

    2.      I first began working for Mr. Livingstone at GO in May, 2003.  As Mr.

            Livingstone's Executive Assistant, I supported all aspects of Mr.

            Livingstone's work at GO, including, but not limited to, opening and

            responding to emails, all scheduling matters for Mr. Livingstone and

            maintaining and updating Mr. Livingstone's electronic Contact List,

            which was his rolodex of personal and professional contacts.

    3.      On or about October 15, 2006, after reading an e-mail from Jeff

            Nyweide concerning Mr. Livingstone's departure from GO on

November 15, 2007, I approached Mr. Livingstone and he confirmed that he was leaving GO, to begin his own professional business solutions consulting firm.  At that time, Mr. Livingstone stated to me that he could not solicit anyone from GO to work with him and therefore was not offering me a job at his new company but quite to the contrary he assured me that I would be able to remain at GO in a similar position.

4.      Mr. Livingstone advised that his last day of work at GO would be November 15, 2006, but that I would continue to support him at GO until January 31, 2007. During that period of time, with the agreement of GO, I would remain Mr. Livingstone's Executive Assistant in order to aid him in his transition to his new business and to aid him in continuing to service  clients, some of whom it was agreed would remain of Mr. Livingstone even after he left GO.

5.      I was aware that there was a Transition Agreement between Mr. Livingstone and GO and that the Transition Agreement confirmed that I would continue to provide Mr. Livingstone administrative support until January 31, 2007.

6.      During the transition period (November 15, 2006-January 31, 2007), I did provide Mr. Livingstone with administrative support.  I also observed, heard and participated in many conversations at and with GO executives.

7.    It was clear in each of these meetings and conversations that GO was aware of Mr. Livingstone's plans to operate his own business which would continue to provide the same or similar services Mr. Livingstone performed while at GO, and would allow Mr. Livingstone to continue to offer his considerable expertise to both current client's of Mr. Livingstone as well as to new client's who may retain Mr. Livingstone's services as well the ability to attract clients whom he could refer to or sub-contract work to GO .

8.    In addition, in January 2007, as part of my responsibilities to assist Mr. Livingstone, I downloaded and provided to Mr. Livingstone an electronic copy of his Contact List.  In doing so, I confirmed with Mr. Taubman that I was permitted to provide Mr. Livingstone with this electronic version.  Mr. Taubman did confirm that the Contact List was Mr. Livingstone's personal rolodex and property and thus he was permitted to take it with him upon his departure from GO.

9.    I also was responsible for advising people who attempted to contact Mr. Livingstone at GO that Mr. Livingstone was no longer working ath GO.  While I was there, I did not observe nor was I aware of any press release or other written statement issued by GO to inform either the public at large or clients of GO of Mr. Livingstone's departure.

10.    In December 2006, despite my initial stated preference to remain as an employee of GO, I was told that I was being terminated from my

3

position, as there was no longer a senior executive assistant position available for me. I was devastated by this news.

11.     Upon learning that I was going to be terminated, I contacted Mr. Livingstone and told him that I wanted to come work for him. Mr. Livingstone immediately made me an offer to work for him in his new business endeavor. Mr. Livingstone asked me to take on greater responsibilities for setting up all of the administrative operations for his new company.

12.     I accepted this position in January 2007 and it was agreed that I would begin working for Mr. Livingstone at ExecutiveAction, upon completion of my work assignments at GO.

13.     In February 2007, I began working at ExecutiveAction. My first responsibilities were to set up all of the needed operational support for the new business. I also continued to serve as Mr. Livingstone's executive assistant, and therefore continued to be responsible for opening and responding to correspondence directed to Mr. Livingstone.

14.     In March 2007no public statements had been made by GO regarding Mr. Livingstone's departure. Accordingly, Mr. Livingstone dictated to me two letters which he intended to distribute by both e-mail and regular United States First Class mail to his Contact List which would advise the recipients of Mr. Livingstone's departure from GO and his start up of his new company, ExecutiveAction.

4

15.    Mr. Livingstone instructed me to prepare two different letters because he did not want to be seen as having solicited clients of GO. Therefore, Mr. Livingstone prepared two separate handwritten lists from his Contact List, where he delineated which contacts were to receive "Letter A" and which contacts were to receive "Letter B".

16.    Sample copies, which are accurate representations of the two letters, are attached hereto as Exhibit 1 and Exhibit 2.

17.    I sent these letters out to Mr. Livingstone's Contact List as he instructed, being careful to insure that no clients of GO received Letter A. See Exhibit 1.

18.    The majority of people who received these letters were not clients of GO, and therefore received Letter B. See Exhibit 2.

I declare under the penalty of perjury that the forgoing is true and accurate to the best of my recollection.

Executed on this the 19 day of April, 2007.          _Jill Horowitz_
                                                                    Jill Horowitz

# EXHIBIT 1

Le Her A

*Neil C. Livingstone*
*Chairman & CEO*

March 9, 2007

Mr. Richard Fields
590 Madison Avenue
32nd Floor
New York, NY 10022

Dear Richard:

I hope this letter finds you well. As you know, we took GlobalOptions public about a year and a half ago and the company continues to grow successfully.

Nevertheless, I left GO on January 31. It was a difficult decision since I founded GlobalOptions in 1998, but I did not like the bureaucratic and other constraints of a public company, nor was I comfortable with some of the disclosures that have to be made, especially concerning our discreet clients and cases.

Accordingly, I founded a new company called ExecutiveAction, which is headquartered on Connecticut Avenue in Washington. It will provide the same range of security, investigative, intelligence, and global problem solving solutions as GlobalOptions, but in addition we've established an M & A practice to focus on acquisitions so that we can rapidly scale up the company.

We've assembled a great team. If you've got time, I'd be delighted to show you around our new offices. Until then, all the best.

Sincerely,


Neil Livingstone

NCL:jeh

# EXHIBIT 2

Letter B

*Neil C. Livingstone*
*Chairman & CEO*

March 7, 2007

Dr. Dana B. Ardi
Managing Director
CCMP Capital Advisors, LLC
245 Park Avenue
16th Floor
New York, NY 10167

Dear Dana:

I hope this letter finds you well. As you know, we took GlobalOptions public about a year and a half ago and the company continues to grow successfully.

Nevertheless, I left GO on January 31. It was a difficult decision since I founded GlobalOptions in 1998, but I did not like the bureaucratic and other constraints of a public company, nor was I comfortable with some of the disclosures that have to be made, especially concerning our discreet clients and cases.

Accordingly, I founded a new company called ExecutiveAction, which is headquartered on Connecticut Avenue in Washington. It will provide the same range of security, investigative, intelligence, and global problem solving solutions as GlobalOptions, but in addition we've established an M & A practice to focus on acquisitions so that we can rapidly scale up the company.

We've assembled a great team and hope that we can provide assistance and support to you in the future. If you've got time, I'd be delighted to show you around our new offices. Until then, all the best.

Sincerely,


Neil Livingstone

NCL:jeh

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GLOBAL OPTIONS INC.,                    :
                                        :
        Plaintiff,                      :
                                        :
                v.                      :        1:07-cv-00608 (PLF)
                                        :
NEIL LIVINGSTONE,                       :
                                        :
        Defendant.                      :
_____ :


ORDER

THIS MATTER having come before the Court on Plaintiff's Motion for

Preliminary Injunction, and the Court having been sufficiently advised,

IT IS HEREBY ORDERED that Plaintiff's Motion for Preliminary Injunction is

DENIED.

IT IS SO ORDERED on this the _____day of _____, 2007.


                                        _____
                                        Hon. Paul L. Friedman
                                        United States District Court