IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GLOBALOPTIONS, INC.,
75 Rockefeller Plaza,
27th Floor,
New York, NY 10019,

    Plaintiff,

v.

NEIL LIVINGSTONE
700 New Hampshire Avenue,
Washington, D.C. 20037,

    Defendant.

Case No. _____

## DECLARATION OF JEFF NYWEIDE

COMES NOW Jeff Nyweide and declares and says, based on his own personal knowledge, as follows:

1. I am the Chief Financial Officer of GlobalOptions Group, Inc. of which GlobalOptions, Inc. is a wholly owned subsidiary and I have personal knowledge of the facts stated herein.

2. The restrictive covenant is precise and limited in scope to Global Options' business activity in the field of high-end risk mitigation services, risk management and security, investigations and litigation support, crisis management, and corporate governance.

3. The restrictive covenant was carefully, indeed exhaustively negotiated between the parties since it was likely that Mr. Livingstone would eventually attempt to intrude upon the business sphere of GlobalOptions since that is the business Mr. Livingstone has been in for at least twenty years.

4. The restriction on Mr. Livingstone's post-GlobalOptions activities was imposed by investors through the Employment Agreement and Noncompetition Agreement when private investors infused funds into Global Options in 2002. They did not want to invest in a business that could be damaged if Mr. Livingstone, after benefiting from the cash infusion, departed and set up competition in Global's area of business.

5. Mr. Livingstone now claims that he received no severance package when he left and apparently feels that this gave him the right to solicit GlobalOptions' clients and compete in its area of business activity in direct violation of his Employment and Noncompetition Agreement. In fact, private investors related to GlobalOptions arranged a buyout of approximately $1,500,000 of Mr. Livingstone's restricted stock, of which he received over $550,000 to date at his request in lieu of severance, kept him in administrative services for three months and permitted him to rely on Global for support in servicing any contracts he may obtain. .

6. Mr. Livingstone claims that his departure was caused merely by differences about the direction and management of Global. In fact, there was no disagreement over the direction of Global since the direction is the same as ExecutiveAction's as Mr. Livingstone pointed out in the thousands of solicitation letter-- however there was a substantial difference over performance of Mr. Livingstone where from 2004 to 2006,

Mr. Livingstone's generation of business for Global declined from $5.3 million to $3.5 million and the expenses associated therewith failed to be reduced.

7.   Contrary to his claim, with Mr. Livingstone's cooperation, GO prepared a joint statement that was released to the Board of Directors, Advisory Board, employees, and to the shareholders in the quarterly public statement. These statements constituted what the parties regarded as public announcements within the transition agreement. Whatever the nomenclature, they served the purpose of the public statement referred to in the transition letter. Moreover, Mr. Livingstone should have brought any dissatisfaction with the joint public announcement to the attention of Global rather than seizing upon that purported deficiency to solicit Global's clients, enter competition in its area of business activity, and publish defamatory letters in Global's field of business. See Exhibit 4 to Schiller Declaration.

8.   Mr. Livingstone claims that he sent out two different letters, one to Global's clients and the other to anyone who had a relationship with GlobalOptions. Defendant's Opposition states, "The difference in the two letters was in the nature of the language used, one being solicitous [sic] and the other not. The non-solicitous letter was sent to anyone who had previously had a relationship with GO." An examination of the two letters demonstrates that they are identical except for the phrase "and hope we can provide assistance and support for you in the future. . ."

9.   First, the content and tone of the two letters are quite similar, the implication of both being the Executive Action is interested in obtaining the recipients' business. Second, it is not true that Exhibit A, the admittedly "solicitous" letter was not sent to

clients of GO. Exhibit 4, to the Schiller Declaration, an "Exhibit A letter," was sent to Ms. Tramunti for Frank Pearl, a long-time client of Global.

10. In addition to soliciting Global's clients and competing in its area of business activity, the Livingstone letters, both Exhibit A and Exhibit B, were highly defamatory and could only have been intended to diminish Global's reputation by falsely implying Global disclosed sensitive information in ostensible contrast to Mr. Livingstone and his new company for which he was seeking business.

11. It is urgent that defendant be required to cease sending out solicitation letters that not only interfere with GlobalOptions' relations with its clients, but also defame GlobalOptions' in its conduct of its highly confidential business activity.

12. The actions of this matter was filed simultaneously with the filing of Global's 10k filings and accordingly, it was premature to make any disclosure of such event, until the matter reached a mature event in order to not misrepresent the matter to the public.

13. Livingstone contents the $1,450,000 paid by Executive to Global was a subcontract payment is a mischaracterization of the facts. The payment represented monies substantially earned by Global prior to the termination date of Livingstone and it was merely an arrangement made for convenience under the transition agreement by and between Global and Livingstone.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:

April 23, 2007
New York, NY

_____
Jeff Nyweide,
CFO, GlobalOptions Group, Inc.